IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-vs-<br><br>FRANCISCO SANTIO,<br><br>Defendant. | **ORDER AND<br>MEMORANDUM DECISION**<br><br><br>Case No. 2:07-cr-378 TC |

Defendant Francisco Santio has filed a Motion to Suppress Evidence. Arguing that the police lacked reasonable suspicion for an investigative stop, Mr. Santio seeks the suppression of the firearm discovered as a result.

Because the police had a reasonable suspicion that Mr. Santio was involved in criminal activity, and a reasonable suspicion that he may have been armed and dangerous, the court DENIES Mr. Santio's motion.

## Findings of Fact

At about 3:30 a.m. on May 16, 2007, South Jordan City Detective Jared Nichols and Deputy Marshall Richard Simonelli received a request for assistance with a stolen vehicle from Detective Bret Miller. Specifically, Detective Miller asked Detective Nichols and Deputy Simonelli to stake out an unoccupied stolen car in case anyone came for the vehicle.

Detective Nichols knew the area Detective Miller wanted them to observe because he had

"been there on some stolen vehicles in the past." (Tr. 9.)[1] Detective Nichols and Deputy Simonelli drove separately to the stolen vehicle in their unmarked police cars. They parked on opposite sides of the vehicle, "blend[ing] in with the rest of the cars on the street." (Id. at 11.) Detective Nichols was on one side of the stolen vehicle—about two houses down from the car—and Deputy Simonelli was approximately thirty yards from the vehicle on the other side.

After twenty minutes without any foot traffic, a man—later identified as Defendant Francisco Santio—and a woman walked directly past Deputy Simonelli in the direction of the stolen vehicle. As Mr. Santio walked down the street of the stolen vehicle, he "kept looking really fidgety, kept looking around, just very suspicious." (Id. at 10.) When he walked as far as the stolen car, Mr. Santio "stopped directly in front of" it, and sat down on the curb across the street from the vehicle. (Id.) Then he "sat down for about a minute or two, and kept looking the area over," as though "he was looking for someone or looking out over the area." (Id. at 10, 12.) Based on this behavior, Detective Nichols "felt [Mr. Santio] had some connection towards the car." (Id. at 11.)

Eventually, Mr. Santio walked away from the stolen vehicle, walking past Detective Nichols's car. As Mr. Santio walked by, Detective Nichols noticed that Mr. Santio wore a white belt down to his knees, which—based on the detective's eight years of experience in law enforcement, and two and one-half years in the metro gang unit—"possibly could be a part of a gang type of a flag, a signal they send out." (Id. at 12.) The detective also noticed Mr. Santio's baggy pants, which "could conceal anything . . .as far as guns, weapons, knives." (Id. at 18.)

---

[1] All transcript citations refer to the Evidentiary Hearing for Mr. Santio's Motion to Suppress, held on September 21, 2007.

Detective Nichols decided to stop Mr. Santio.  The detective pulled behind Mr. Santio in his unmarked car and turned on his emergency lights.  At first, Mr. Santio "[j]ust kept walking," but then he eventually stopped.  (Id. at 27.)  Detective Nichols got out of his car, identified himself, and explained that he had stopped Mr. Santio because of the stolen car.  Deputy Simonelli approached Mr. Santio from the other side.

While explaining the reason for the stop, Detective Nichols "noticed that [Mr. Santio] had a tattoo of a spiderweb right on his chin."  (Id. at 14.)  According to the detective, the tattoo "could mean time served."  (Id. at 17.)  Detective Nichols asked Mr. Santio if he was involved with gangs, to which Mr. Santio "said [his gang moniker] was 'Trouble' and he kicked it with Southside."  (Id. at 14.)

When Detective Nichols asked Mr. Santio if he had any weapons, Mr. Santio volunteered that "he had a couple of pair of scissors," and started to remove them from his pockets.  (Id. at 18.)  After Mr. Santio threw two pairs of scissors on the grass, the detective told Mr. Santio to stop reaching into his pockets, and patted Mr. Santio down for weapons.  While patting Mr. Santio down, "in his left pocket, [Detective Nichols] felt what [seemed] to be a gun magazine" with "nine .40 caliber bullets in it."  (Id.)  Detective Nichols asked Mr. Santio if he was a convicted felon, to which Mr. Santio responded "'yes.'"  (Id.)  The detective handcuffed Mr. Santio.

The woman walking with Mr. Santio told Deputy Simonelli that a gun was just a few feet away and "pointed to where the firearm was located by the fence."  (Id. at 43.)  The detectives found the gun about ten feet away in an area Mr. Santio had walked past.

**Analysis**

Courts consider the reasonableness of an investigative stop and frisk under the principles of Terry v. Ohio, 392 U.S. 1 (1968). In Terry, the Supreme Court "established that a police officer 'may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest.'" United States v. Treto-Haro, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting Terry, 392 U.S. at 22). "Accordingly, an investigatory stop or detention of a person need only be supported by a reasonable suspicion of criminal activity." Id. During "a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous." United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996); see also United States v. Lang, 81 F.3d 955, 964-65 (10th Cir. 1996) (("[A] Terry v. Ohio stop, involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so.") (citation omitted)).

To resolve Mr. Santio's motion, the court must determine: (I) whether there was a reasonable suspicion to justify the initial stop of Mr. Santio; and (II) whether there was a reasonable concern for officer safety to justify the search of Mr. Santio.

**I.   Initial Stop**

When considering whether the police have reasonable suspicion to justify a stop, courts "must examine the totality of the circumstances, meaning that reasonable suspicion may exist even if 'each of the[] factors alone is susceptible of innocent explanation.'" United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003) (quoting United States v. Arvizu, 534 U.S. 266, 277

4

(2002)). And courts must "determine whether the 'historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause.'" United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). But the Tenth Circuit has "explained that 'an officer with reasonable suspicion need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis' for a stop." United States v. Moran, 503 F.3d 1135, 1140 (10th Cir. 2007) (quoting Vercher, 358 F.3d at 1261). "[E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of the circumstances." Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000).

Based on the totality of circumstances, Detective Nichols and Deputy Simonelli had a reasonable suspicion that Mr. Santio was involved in criminal activity to justify the initial stop.

First, the police observed Mr. Santio and his female companion walking in a high-crime neighborhood, familiar to Detective Nichols because he had "been there on some stolen vehicles in the past." (Tr. 9.) See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis."); United States v. Solo-Cervantes, 138 F.3d 1319, 1323 (10th Cir. 1998) (("While the fact that an individual is in a neighborhood known for drug activity is not sufficient by itself to support a reasonable suspicion that the individual himself is engaged in criminal activity, it can support a finding of reasonable suspicion when combined with other factors.") (citation omitted)).

Second, they were walking around this high-crime neighborhood very late at night, at

approximately 3:30 a.m.  See United States v. Barbee, 968 F.2d 1026, 1029 (10th Cir. 1992) (considering that vehicle "was traveling in the evening, after dark" as one factor to support reasonable suspicion).

Third, Detective Nichols recognized Mr. Santio's long white belt as a possible indicium of gang involvement.  See United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful evidentiary value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a Terry stop.").

Fourth, Detective Nichols and Deputy Simonelli both credibly testified that Mr. Santio was acting in a suspicious manner, leading both of them to believe Mr. Santio was involved with the stolen vehicle.  See United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (("'This approach is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'") (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995), cert. denied, 517 U.S. 1143 (1996))).

And fifth, the detective and deputy were called by a fellow officer to watch for anyone who may have an interest in a specific stolen vehicle.  By walking up to the stolen vehicle, and then sitting directly across from the vehicle for nearly two minutes, Mr. Santio manifested an interest in the vehicle.  Detective Nichols testified that this behavior made him believe Mr. Santio "had some connection towards the car."  (Tr. 11.)

Altogether, the police had a reasonable suspicion that Mr. Santio was involved with the

stolen vehicle to justify briefly stopping him and asking a few questions.

## II.     Search of Mr. Santio

"During an investigative detention, '[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.'" United States v. Garcia, 459 F.3d 1059, 1063 (10th Cir. 2006) (quoting United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)).  A police officer may "'conduct a pat-down search (or "frisk") if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous.'" Id. at 1064 (quoting United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000)).

Here, the police had ample reason to believe Mr. Santio might be armed and dangerous.

First, when Detective Nichols started speaking with Mr. Santio, Mr. Santio confirmed his gang affiliation and identified himself by the name "Trouble."  See id. at 1066 (citing United States v. Atlas, 94 F.3d 447, 450-51 (8th Cir. 1996) ("officers had reasonable suspicion that a suspect was armed and dangerous in part because 'the officers were responding to a call in a dangerous neighborhood, one that was high in gang activity'")).

Second, Detective Nichols immediately noticed that Mr. Santio was wearing baggy pants, which "could conceal anything . . . as far as guns, weapons, knives."  (Tr. 18.)  See United States v. Maiden, No. 91-50039, 1992 WL 72902, at *1 (9th Cir. Apr. 13, 1992) (explaining "[Defendant]'s baggy clothing could conceal a weapon" was relevant to "hold[ing] that the pat-down search of [Defendant] was supported by a founded suspicion that he was armed and dangerous.").

Third, Detective Nichols also noticed Mr. Santio's spiderweb tattoo on his face.  Based on the detective's training and experience, "the only thing that" the tattoo could mean was "time

served" in prison. (Tr. 17, 29.) See United States v. Jeter, 175 Fed. Appx. 261, 265 (10th Cir. 2006) ("Defendants' tattoos, which suggested possible gang affiliation and a tendency towards violence, were also a part of the totality of the circumstances justifying Trooper Salas' extended questioning of Defendants.").

And most importantly, Mr. Santio admitted that he was carrying weapons and removed two pairs of scissors from his pockets. The Tenth Circuit has expressly approved frisking an individual who "told the officers he had a knife and reached for it." United States v. Malouff, 114 Fed. Appx. 975, 979 (10th Cir. 2004) ("[Defendant's] statement that he had a knife coupled with his reach to his pocket gave the officers an objective basis to believe he was armed and dangerous; thus, the search of his pockets was justified."). Once the police knew Mr. Santio was carrying weapons, they had an undeniable concern for safety to justify the minimal intrusion of the search.

## Order

For the reasons stated above, the court DENIES Mr. Santio's Motion to Suppress Evidence (dkt. #11).

SO ORDERED this 29th day of November, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge